**In the United States District Court
District of South Carolina
Anderson Division**

| | |
|---|---|
| Marc Justice, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Complaint |
| ) | |
| Duke Energy Corporation, ) | (Jury Trial Demanded) |
| ) | |
| Progress Energy, Inc, ) | |
| ) | |
| Bartlett Holdings, Inc. (d/b/a BHI ) | |
| Energy), ) | |
| ) | |
| BHI Energy I Power Services, LLC, and ) | |
| ) | |
| Power Equipment Maintenance, Inc., ) | |
| d/b/a PEM, a BHI Energy Company ) | |
| ) | |
| Defendants. ) | |

Plaintiff, through his attorney would respectfully show unto this Court as follows:

1. Plaintiff is a resident of Pickens County, South Carolina.

2. Defendant Bartlett Holdings, Inc. (d/b/a BHI Energy) ("BHI") is a foreign corporation with a principal place of business in Massachusetts.

3. BHI operates and manages Power Equipment Maintenance, Inc. ("PEM").

4. PEM was a South Carolina Corporation based in Anderson County, South Carolina that was operated by BHI.

5. Subsequent to the issuance of a Notice of Right to Sue ("RTS") by the Equal Employment Opportunity Commission ("EEOC"), Defendant BHI merged PEM into Defendant BHI Energy I Power Services, LLC ("BHIPS") such that PEM no longer exists as a separate entity.

1

6. BHIPS is a Delaware limited liability company and a successor in interest and successor employer to PEM.

7. BHI, BHIPS, and PEM are referred to collectively here as "BHI Defendants."

8. Duke Energy Corporation ("Duke Energy") is a foreign corporation with a principal place of business in North Carolina.

9. Progress Energy, Inc. ("PEI") is a foreign corporation with a principal place of business in North Carolina.

10. Duke Energy owns and operates the Oconee Nuclear Station ("ONS") in Oconee County, South Carolina.

11. Plaintiff was employed by Duke Energy and the BHI Defendants to work at the ONS.

12. Duke Energy shared in the control, direction, and supervision of Plaintiff and was, at all times, a joint employer with the BHI Defendants. By way of example:

   a. At the ONS, Plaintiff worked along with Duke Energy employees;

   b. Plaintiff performed the same tasks as Duke Energy employees;

   c. Plaintiff worked exclusively for Duke Energy;

   d. Plaintiff received direction as to his day-to-day duties and supervision from Duke Energy supervisors as Duke Energy provided the only on-site supervisors;

   e. Duke Energy controlled the manner and means by which Plaintiff performed his functions and duties;

   f. Plaintiff's direct supervisor, a Duke Energy employee, assigned Plaintiff his work;

g. Duke Energy promulgated the work rules applicable to Plaintiff's employment;

h. Duke Power maintained and exercised the right to the approve employees, control the number of employees, and have an employee removed;

i. Duke Energy inspected and approved the work done by Plaintiff;

j. Plaintiff worked on Duke Energy premises and worked with Duke Energy equipment;

k. Duke Energy maintained the power to exclude Plaintiff from its site and to direct that discipline be taken against him;

l. Duke Energy retained and exercised the power to effectively terminate Plaintiff's employment;

m. Duke Energy exercised substantial control over significant aspects of the compensation, terms, conditions, or privileges of plaintiff's employment, including but not limited to, assignments, training, and opportunities for advancement;

n. Plaintiff performed discrete functions that were unique to Duke Energy's operations; and

o. Plaintiff had no choice as to the customer or client of PEM for which he worked.

13. While employed at the ONS, Plaintiff learned of and observed Duke Energy employees verbally, physically, and sexually abusing an employee with disabilities. The harassment visited on this employee was severe and pervasive

in that it was repeated, violent, physically and mentally demoralizing, and demeaning in both a physical and/or sexual manner.

14. In 2011, Plaintiff reported the harassment to Defendants.

15. Duke Energy investigated the harassment reported by Plaintiff and it disciplined and terminated several Duke Energy employees as a result of Plaintiff's complaints of unlawful conduct.

16. The retribution Plaintiff faced after he reported the harassment and responsible employees were disciplined and discharged was both swift and unrelenting. By way of example,

   a. Plaintiff was ostracized by both employees and management;

   b. Defendants refused to permit Plaintiff to enjoy the same opportunities and access to assignments and promotions, including training, accorded other employees who did not engage in protected activity;

   c. Plaintiff was reassigned to less desirable assignments and isolated, was passed over for assignments, denied training opportunities and assignments/promotions for which he was qualified;

   d. Plaintiff was not only threatened with repeated discipline (to which he was never subjected to prior to his complaints), but Defendants actually imposed discipline upon him in a disparate manner;

   e. Defendants subjected Plaintiff to continual complaints by a discriminating manager about the action taken by Duke Energy in response to Plaintiff's reports, and permitted that manager to impose discipline on Plaintiff and subject Plaintiff to drug testing without reason or cause;

    f.    Defendants reassigned Plaintiff to areas in which work would be not be available when work was still available in his prior assignment;

    g.    Defendants repeatedly suspended Plaintiff's employment for reasons that Plaintiff repeatedly showed were groundless, including a suspension to investigate an allegation by one of the harassers Plaintiff reported earlier, who was not terminated even though he engaged in far worse conduct than anything Plaintiff was even alleged to have engaged in and who admitted to holding a grudge against Plaintiff;

    h.    Defendants placed Plaintiff on an indefinite and never-ending suspension after he complained about further retaliation when, in fact, not only was no investigation underway, but there was nothing to investigate as the claims, which Defendants knew were made against Plaintiff by those with admitted grudges against him, already were found to be unverifiable;

    i.    Defendants terminated Plaintiff's employment;

    j.    Defendants black-balled Plaintiff and precluded him from obtaining other employment.

All of these actions were reasonably calculated to punish Plaintiff for his reports and to dissuade any further reporting by himself or any other coworker.

17.    After one investigation when Plaintiff complained about being disciplined and suspended wrongfully for allegedly sleeping on the job (a decision driven by a manager who openly and repeatedly professed discontent about Plaintiff reporting misconduct) when he was not doing so, Defendants ultimately removed the discipline and instructed him that, as a condition of reinstatement, he was to

not bring up any allegations of disparate treatment. This instruction clearly was calculated to prevent the further reporting of concerns regarding Defendants' unlawful conduct and further evidences Defendants' retaliatory intent.

18. An internal investigation conducted by Duke Energy's Employee Concerns Consultant and HR Director ("the internal investigation team") issued an investigative report (the "Report") into Plaintiff's later complaints regarding retaliation. The Report not only cleared Plaintiff of the allegations against him, but repeatedly corroborated allegations he had made about being ostracized by Defendants. More significantly, the Report confirms the retaliatory motives and animus of Duke Energy's own management. For example,

   a. one employee directly involved in the conduct Plaintiff reported not only admitted to the ostracizing Plaintiff and to the hatred and resentment towards Plaintiff, but attributed them to Plaintiff's protected activity;

   b. The attitude of the aforementioned individual was not isolated. To the contrary, it was emblematic of an attitude that pervaded the environment. Many employees complained about Plaintiff's protected activity. In fact, the Report concluded, "It is clear to the IIT that Mr. Justice's 2011 report of misconduct played a substantial role in these workers' views. . . . . The bases for these workers views, in most cases, referred back to Mr. Justice's 2011 report of misconduct to HR in one way or another." The report further corroborated that these employees expressed such concerns to supervision and management.

c. The nexus between Plaintiff's protected activity and the hostile environment to which Defendants subjected him is made repeatedly in the Report. For example, Report states that "[m]ost of the interviewees describing the hostile environment . . . also linked it to" Plaintiff's report of misconduct. "One individual stated that as a result of the HR investigation in 2011, that they fired three people and pulled their unescorted access clearances and that instead 'they should have run Justice off years ago.'" According to the report, "Another FRS[1] employee who stated he personally had no problem with Mr. Justice and believed he was a really good worker did note that several of the individuals fired in 2011 were good buddies to many in FRS and that many people had a problem with Mr. Justice and were made at him as a result and it was likely that Mr. Justice felt alienated even though he had done the right thing in reporting the concerns." (footnote added)

d. The Report further quotes employees as saying such things as they "hated Justice." The report plainly finds that "individuals also . . . said they would not work with Mr. Justice due to a lack of trust," and that they distrusted him "referring to the perception that Mr. Justice had cost other individuals their jobs" and again they accused Plaintiff of being "not mentally stable."

---

[1] FRS is an acronym for Fleet Reactor Services, a group within Duke Energy at the ONS.

e. The Report notes that employees who were not employed when Plaintiff engaged in protected activity "for the most part consistently stated that they personally had no issue with Mr. Justice, but they were cautious or afraid to work with Mr. Justice because they sensed the tension in the group . . . and due to the pervasive rumors and reputation that they learned of when joining the group."

f. The Report also credits another newcomer, who, based on the pervasive rumors Defendants allowed to be spread about Plaintiff, "stated that Mr. Justice was viewed as a 'whistleblower' and thus individuals on the crew had lost trust in him."

g. The Report discusses "several" employees expressing dismay about the lack of disciplinary action taken against Plaintiff, expressing intimate knowledge regarding allegations that purportedly are confidential, but that obviously were leaked repeatedly by management.

h. The Report also concludes that "supervision and management did little or nothing to counteract the workers' attitudes toward and distrust of Mr. Justice.   Indeed, **the evidence shows that to some extent, management made it known to workers that they shared some of their opinions of Mr. Justice, thereby validating these opinions and their bases**." (emphasis added).

i. An individual identified in the Report as a "manager" reportedly told the investigative team that "management at [Duke Energy] all were concerned to work with Mr. Justice as they were afraid of him."

j.  Another glaring example of Duke Energy's management attitude towards Plaintiff resulting from his protected activity is found in the testimony of another "site FRS manager[, who] stated that among supervisors at [Duke Energy], there is a reluctance to work with Mr. Justice because they are scared of him.  The managers stated unequivocally  that Mr. Justice should not be in FRS as his removal would relax the atmosphere in the group. . . . . The manager stated that he recommended that Mr. Justice be released following" the allegations made against him that were not substantiated.

k.  Duke Energy management's participation in spreading rumors and fueling discontent to foster a hostile environment also is evident from the Report's finding that an employee was told by a manager that, after the purportedly-confidential investigation into whether Plaintiff made an inappropriate comment about a coworker's family member "Mr. Justice was allowed to return to ONS only due to intervention by Duke Energy lawyers."  As Defendants were well aware, Defendants did not find wrongdoing on Plaintiff's part, even though they imposed a lengthy suspension on him.  Nonetheless, management further made the working environment toxic for Plaintiff by spreading malicious rumors to the contrary.

l.  The Report also credits the testimony of one individual, who stated that "supervisors had to keep in mind the pervasive feeling amongst FRS that

      'I don't want to work with him' and balance assignment in order to 'keep the peace."

  m.  Further evidence of Duke Energy's own management intentions is found in another supervisor's statement that management was "forced to deal with a situation in which individuals did not want to work with Mr. Justice, and the situation was difficult to manage. The same supervisor stated that he was concerned that should Mr. Justice be allowed to return to the group that he was not sure how to manage that situation and did not need to 'be on an island' and would need help from someone."

19.  The Report further concluded:

> Supervisors and managers were acutely aware of the concerns raised by Mr. Justice in 2011, and the impact that Mr. Justice's actions had on the FRS group at ONS and MNS. Supervisors and managers were directly affected by Mr. Justice's actions and had serious reservations about keeping him within the organization . . . .[T]hey also acknowledged that Mr. Justice's mere presence was disruptive and distracting given how the FRS organization was reacting to him following the 2011 incident and had difficulty managing the group given the affect [sic] this was having on work performance and culture. Some supervisors and management stated that they believed it would simply be best that Mr. Justice be released; however they believed that this prudent path forward had been blocked by HR and legal as Mr. Justice was "bulletproof" because he had raised concerns to HR in 2011.
>
> . . . . Supervisors and managers recognized that following the termination of three individuals in 2011 there was a great deal of mistrust and negative personal feelings directed towards Mr. Justice. It appears that supervisors were struggling with a situation in which they were required to deal with an individual that others did not want to work with and that this complicated their duties and responsibilities. Given the difficulties and mistrust, some supervisors were concerned about Mr. Justice being permitted to return.

> Another manager stated that Mr. Justice should not be allowed to work in FRS and that his continued absence would relax the atmosphere in the group.
>
> * * * *
>
> Supervisors and managers claimed that their opinion that Mr. Justice should be released to PEM and not permitted to return to FRS was based on past disciplinary actions . . . . [T]hey also repeatedly stated that Mr. Justice's presence was a distraction and disruptive to FRS. This attitude was at odds with statements from some FRS supervisors and managers who stated that Mr. Justice was actually a good worker, and statements from supervisors in turbine maintenance who stated that he was a good worker. . . . .[There was a pervasive view that no member of supervision or FRS worker wanted to work with Mr. Justice as they were afraid of him."

20. Despite undeniably knowing that employees, supervision, and management were engaging in such conduct, that it was, by Duke Energy's own terms "pervasive" and wide-spread, that the "pervasive" view of management was to not let Plaintiff return, that such views and actions were related directly to Plaintiff's protected conduct, and that such a "pervasive feeling" affected things as job assignments and management's willingness to work with Plaintiff, Defendants failed to take any effective corrective action.

21. To make matters worse, after the Report documented Duke Energy's knowledge of harassment and retaliation by coworkers and management, the only adverse action Defendants took was to accede to the demands of the very management who tied their own aversion to Plaintiff to his protected activity. Defendants further suspended Plaintiff and barred him from assignments and released him to PEM, just as those in supervision and management harboring resentment towards Plaintiff request.   Put differently, Defendants implemented

11

management's request during the investigation that Plaintiff be put in a state of "continued absence."

22. Remarkably, despite its own investigation, concluding that there was a "pervasive" hate and animosity towards Plaintiff, that this resulted in both management and employees avoiding Plaintiff, that the pervasive animus towards Plaintiff was embraced and fueled by Duke Energy's own supervision and management, and despite knowing that such animosity was directly attributable to Plaintiff's protected activity, Duke Energy falsely represented to the EEOC that "the overall dynamic" in Plaintiff's area "improved" and that the only fallout was that a few nonsupervisory employees "may have elected to not foster friendships with Mr. Justice."

23. While Duke Energy plainly documented the consensus among its management that it did not want Plaintiff returned – a view that carried the day – Duke Energy repeatedly, and almost comically, expressed to the EEOC its gratitude for Plaintiff's reporting of the issues in 2011, which it described as a "commendable act."

24. Further, despite Duke Energy's own findings that Plaintiff was subject to reprisals by employees, supervisors, and management that is directly tied to his complaints in 2011, Duke Energy represented falsely to the EEOC that "[a]t no time during or following Mr. Justice's speaking up on behalf of [his coworker] was he subjected to reprisal."

25. As if Duke Energy's own investigation was not enough, in-house counsel for BHI Energy told Plaintiff that Duke Energy employee complaints were in retaliation for

      Plaintiff's reports about the harassment of his coworker. This fact is confirmed by the self-serving notes of counsel, which were revealed during the EEOC investigation. In those notes, counsel opines that imposing serious discipline on plaintiff would invite a retaliation claim because of his protected activity. After counsel unilaterally raised the issue on his own, he dismisses such concerns as "not true." Defendants are well aware that the allegations of retaliation were true and it is clear from both the Report and BHI's own records that Plaintiff's protected activity remained at the forefront of the decision-makers' minds.

26. BHI also has documented that Duke Energy expelled Plaintiff from the work place because Duke Energy "had concerns about him being a disruptive factor if allowed to stay." As Duke Energy's own Report makes clear, the "disruptive factor" rationale was based on the fallout resulting from Plaintiff's protected conduct, and not on the work performance of Plaintiff.

27. As noted above, Plaintiff complained about the retaliation he faced, which resulted only in further retaliation. Plaintiff complained to both Duke Energy and the BHI Defendants repeatedly about harassment he was incurring by coworkers and management. His first complaint was shortly after Duke Energy terminated individuals in response to Plaintiff's complaint, and the last was after Plaintiff was suspended for a lengthy period of time because he allegedly made an inappropriate comment (an allegation even Defendants concluded could not be substantiated but that they knew came from employees with admitted axes to grind with Plaintiff because of his protected activity).

28. According to the BHI Defendants, Duke Energy dictated the decisions to return Plaintiff to PEM (i.e. release him), to reassign Plaintiff, and to not allow him to return to his regular position. BHI Defendants have cited a purported ongoing investigation, which is obviously false and pretextual as the investigation was completed before some openings occurred. In fact, the BHI Defendants have acknowledged that work has subsequently become available for Plaintiff, but have claimed that Duke Energy refused to allow him to be reinstated because of the investigation, which was already concluded.

29. Plaintiff applied for work with PEI in March, 2013. The interviewer for PEI asked Plaintiff how he would handle a situation in which a fellow employee was harassing or discriminating another employee. Plaintiff informed the interviewer that, if the incident was minor, he would engage in peer coaching, but anything severe would require him to report the matter to my supervisors or to Human Resources. The interviewer then specifically asked Plaintiff about his situation with Duke Energy and the BHI Defendants and his reporting of conduct in 2011. Plaintiff informed the interviewer that he did not want to discuss the matter. Shortly thereafter, the interviewer contacted Plaintiff and told him he was not selected for a position because he was not qualified in that he lacked experience. Plaintiff did not raise the issue of his prior protected conduct, and does not know how the PEI interviewer knew about it to ask. Clearly, however, Plaintiff was denied the position because of his protected activity and the purported basis that he did not have experience is false and pretextual.

30. Defendants' actions were intentional, willful, and done in reckless disregard for the rights of Plaintiff.

31. Defendants' actions violate 42 U.S.C. § 12203.

32. This Court has jurisdiction to address Plaintiffs' claims and venue is proper in this District and Division.

33. Prior to commencing this action, Plaintiff filed charges of discrimination with the EEOC and Plaintiff commences this action within 90 days of his receipt of RTS notices.

## Count I
## For a First Cause of Action
## Americans with Disabilities Act Retaliation

34. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

35. Plaintiff participated in internal investigative process and opposed unlawful discrimination by Defendants.

36. Plaintiff complained not only of the severe and pervasive harassment of a coworker, but also about the retaliatory treatment Plaintiff endured as a result of his own complaints.

37. Defendants retaliated against Plaintiff as a result of his complaints and participation in Defendants' processes and for his opposition to Defendants' unlawful conduct.

WHEREFORE, Plaintiff seeks a trial by jury on his claim of unlawful retaliation and entry of judgment and all other available legal and equitable relief, including injunctive relief against further disparagement or black balling, actual damages including back pay and front pay, compensation for lost benefits, compensatory damages, punitive damages, attorney fees, costs, and interest.

Respectfully submitted this 11th day of February, 2015.

                          s/ Brian P. Murphy_____
                          Brian P. Murphy, Bar No. 6770
                          Attorney for

Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, SC 29601
Phone: (864) 370-9400
Fax:   (864) 240-9292